(No. 88-CC-3240– <span style="background:black">     </span>)

NORMAN C. JOHNSEN, Claimant, *v.* BOARD OF TRUSTEES OF
SOUTHERN ILLINOIS UNIVERSITY, Respondent.

*Opinion filed January 13, 1995.*

CARR, KOREIN, TILLERY, KUNIN, MONTROY, GLASS &
BOARD (STACI M. YANDLE, of counsel), for Claimant.

REED, ARMSTRONG, GORMAN, COFFEY, THOMSON,
GILBERT & MUDGE (JOHN L. GILBERT, of counsel), for
Respondent.

## OPINION

FREDERICK, J.

Claimant filed his claim in the Court of Claims on
March 15, 1988. Norman C. Johnsen, the Claimant, con-
tends that the Respondent, the Board of Trustees of
Southern Illinois University, improperly terminated his
position as a tenured professor.

The Claimant was initially hired by Southern Illinois
University at Edwardsville (SIUE) as a community devel-
opment specialist in 1962. Claimant remained in that posi-
tion for five years until he switched his focus to the devel-
opment of SIUE's new campus in 1967. On April 1, 1967,
Professor Johnsen was appointed to the Department of
Earth Sciences, Geography and Planning, and was fully
tenured on April 1, 1971. In September 1971 the Illinois
Board of Higher Education approved the Masters of
Science Degree in City and Regional Planning (MCRP

program). The MCRP program was in the Earth Sciences Department within the Division of Social Sciences.

Southern Illinois University at Edwardsville is an institution of higher education governed by its own by-laws and statutes adopted by its board of trustees. Among those statutes and by-laws are specific guidelines regarding tenure within the university. Pursuant to the by-laws and statutes approved July 1, 1964, with amendments on March 10, 1977, SIUE adopted regulations regarding the termination of tenured faculty. These regulations permit termination of a tenured professor for cause or in case of financial exigency or cutbacks in its programs. The statutes and by-laws indicate that the termination process of a tenured professor should conform to the principles of the American Association of University Professors (AAUP).

In April of 1983 Claimant learned of the university's intent to terminate the MCRP program. At that time, Social Sciences Dean Susan Jacobitti informed Claimant that the trustees of the university were likely to eliminate the program. Following this meeting with Dean Jacobitti, Claimant met separately with Dean Samuel Pearson, Jacobitti's successor and vice president, and with Barbara Teters, then vice president provost.

On May 4, 1984, Dr. Teters and Dean Pearson met with Professor Johnsen to inform him of the schedule of events assuming that the decision to terminate the MCRP program would be approved by the board of trustees. On May 14, 1984, Dr. Teters sent a letter to Claimant outlining the substance of their earlier meeting.

As part of the May 14, 1984, letter, Dr. Teters outlined the university's plan concerning Claimant's future employment. First, Claimant would remain on full salary for two years and would be given a light teaching load;

second, Dr. Teters would circulate Claimant's curriculum vitae (CV) to all units in Academic Affairs and to the directors of other areas for consideration for employment with or without a period of retraining; third, a proposal for preparatory period would be considered if Claimant wished to seek employment external to the university; fourth, the director of personnel would see to it that Claimant received all job announcement sheets and would also forward copies of the appropriate job announcements from other agencies and institutions; and finally, the director of personnel would write to his counterparts in other State institutions to ascertain whether they had any openings that would have been of interest to Claimant. Claimant made no objections to this plan.

Additional programs and tenured faculty were terminated along with Claimant's program and Claimant's tenured faculty position, including the Human Services program and several other faculty members, all of whom the university sought to accommodate along with Claimant.

On June 14, 1984, Dr. Teters sent a letter to Claimant informing him of five openings which were anticipated to occur in the School of Social Sciences during the following two years. She also reiterated her intent to circulate Claimant's CV with her recommendation that he be given prior consideration for any openings within the following two years.

On June 15, 1984, Dr. Teters sent a memo to the dean of the School of Social Sciences indicating that Claimant and other affected faculty might be seeking appointments to the positions which were outlined in her letter dated June 14, 1984. Dr. Teters also requested that any applications from Claimant and other affected faculty members be given consideration and that no other persons should be offered positions unless the candidacy of

Claimant and other affected faculty members were reviewed.

On July 19, 1984, Dr. Teters circulated Claimant's CV to the Academic Affairs Conference. Dr. Teters requested that the CV be reviewed and that Claimant be given consideration for any openings in the following two years. The deans were instructed to inform Claimant directly if any position became available. The following day, the dean of the School of Social Sciences sent a memo to department chairs identifying faculty which had been adversely affected by termination of the MCRP program and expressing their desire to remain with the university. The chairs were informed that the faculty's CVs were in the dean's possession and available for review.

On September 18, 1984, Dr. Teters sent a memo to Claimant and other affected faculty members with an attached job announcement for the position of academic advisor. The faculty members were instructed to reply to the director of the office of Academic Services. Claimant did not follow up on the academic advisor position and received no further contact from the university regarding possible openings.

Dr. Teters and Dean Peterson continued to consider Claimant for positions and explore employment possibilities for Claimant following Dr. Teters' memo of September 18, 1984, although Claimant may not have been aware of these efforts.

In 1986, pursuant to Claimant's internal grievance, the disciplines in which he believed he could continue to teach were canvassed by the university. No positions were identified which were either available or for which Claimant was best qualified.

A peer committee was formed in May of 1985 to review the university's administration's efforts to respond to all the faculty affected by the various program terminations at the time. The committee was styled the Ad Hoc Committee. The committee determined that the university's efforts regarding Claimant were adequate.

While Claimant was not told to seek work elsewhere after his meeting with Dean Jacobitti, her memorandum clearly established that Claimant knew or should have known of the uncertainty of his position as early as May of 1983. Claimant never identified a position which Claimant believed should have been made available for him or was available and which he could fit. Had Claimant applied for the position in the office of Academic Services of which he was notified on September 18, 1984, he likely would have been hired for that position. Claimant voluntarily retired in June of 1986 and has been receiving retirement benefits ever since.

The parties are in agreement that the termination of the Claimant's tenured position was to conform to the principles of the American Association of University Professors (AAUP). The parties disagree on what those principles are. The testimony of Dr. Peters established that the university interpreted its policies to obligate the university to be as helpful as possible, match employees with needs, perhaps provide modest retraining and special consideration for positions.

The university's obligation was characterized by Dr. Teters as an obligation to make every reasonable effort within prevailing constraints to find other employment for displaced tenured faculty depending upon the circumstances. Dr. Teters confirmed this as the view of the administration of the university pursuant to its tenure policy. Dr. Teters also indicated that if there were appropriate

openings in existence which could be filled by Claimant or other displaced faculty, the university would make a special effort to try to see that the person received the position. She clearly indicated that no positions would be created.

Claimant's expert, Matthew Finkin, explained the obligation, according to Claimant's position, as the university making every effort to find a suitable position for Claimant if there was one for which he was qualified. He understood the obligation to include the amendments to the AAUP.

Respondent contends that the evidence established that the university was obligated to make reasonable efforts under all prevailing and applicable circumstances to attempt to find alternate employment for the Claimant within the university until he retired in July of 1986.

Claimant contends the AAUP's later adopted Recommended Institutional Regulations (RIRs) which put a duty on the university to make every effort to find Claimant a suitable position. Respondent argues the university never adopted the RIRs.

In a wrongful discharge case, the burden is upon the claimant to prove his case by a preponderance of the evidence. (*Leonida v. State* (1979), 33 Ill. Ct. Cl. 125.) Claimant's position appears to be that because he is a tenured professor whose program was validly abolished, he can sit back, do nothing, and even fail to apply for a position. If the university does not make every effort to find him suitable employment within his department whether such employment exists or not, he can then collect $222,747.53.

We find this position untenable. We need not find that the university must make every reasonable effort or every effort because under the facts of this case, using either

effort would have made no difference. When the MCRP program was validly terminated, additional programs and faculty were also terminated. There were only so many positions available which could be filled by the affected faculty. It is unfortunate, but there just was not an employment fit for Claimant within the university. As there was no employment fit, he was not wrongfully discharged. If Claimant had shown a position for which he was qualified that went to a non-tenured faculty member during the two-year period or some other evidence that he was wrongfully denied an employment fit for him, he would have been well on his way to meeting his burden. We are convinced under the facts and circumstances of this case that the Respondent made substantial efforts to place Claimant in employment within the contexts of available positions and Claimant's desires. The evidence, however, is overwhelming that there just was not a position for Claimant at SIUE after the MCRP program was terminated.

We are also concerned with Claimant's attempts to mitigate his damages. If we had found a wrongful discharge, which we have not, it appears from the evidence that beyond retiring, Claimant did virtually nothing to mitigate his damages. (*Umbaugh v. Board of Trustees of SIU* (1985), 37 Ill. Ct. Cl. 151.) Because of our decision on wrongful discharge, we need not reach the issue of lack of mitigation.

For the foregoing reasons, and because we find Claimant was not wrongfully discharged, it is the order of this Court that Claimant's claim be and is hereby denied.